## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| YELL-O-GLOW CORPORATION, individually and on behalf of itself and all others similarly situated,<br><br>              Plaintiff,<br><br>     v.<br><br>CAL-MAINE FOODS, INC, DAYBREAK FOODS, INC., HILLANDALE FARMS CORP., ROSE ACRE FARMS, INC., VERSOVA HOLDINGS, LLC., and DOE DEFENDANTS 1-20,<br><br>              Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## Table of Contents

*INTRODUCTION* ............................................................................................................. 3

*JURISDICTION AND VENUE* ....................................................................................... 7

*INTERSTATE TRADE AND COMMERCE* ................................................................ 8

*PARTIES* ......................................................................................................................... 9

   **A.  Plaintiff** ............................................................................................................. 9

   **B.  Defendants** ........................................................................................................ 9

   **C.  Agents and Co-Conspirators** ......................................................................... 11

*FACTUAL ALLEGATIONS* ......................................................................................... 12

   **A.  The U.S. Egg Industry** ................................................................................... 12

   **B.  Shell Egg Production** ...................................................................................... 15

   **C.  The Urner Barry Egg Index** ......................................................................... 16

   **D.  Role and Scope of ECI in the U.S. Egg Market** .......................................... 17

   **E.  Expana and Urner Barry** .............................................................................. 17

   **F.  Shell Egg Pricing and the Role of Urner Barry and Expana** ..................... 18

   **G.  Urner Barry's Benchmark Pricing Methodology** ...................................... 19

   **H.  Overview of the Avian Influenza** .................................................................. 20

   **I.  Impact and Timeline of the 2022 Avian Influenza Outbreak** ..................... 20

   **J.  Egg Prices** ....................................................................................................... 21

   **K.  The Historical Affordability and Recent Artificially Inflated Price Trends in Eggs**  21

   **L.  The Dramatic Surge in Egg Prices is a Result of Defendants' Unlawful Conspiracy and Per Se Violations of United States Antitrust Law** ................................ 22

      1.  Defendants Use the UB Index to Price Eggs and as a Scapegoat ................................ 22

   **M.  The Defendants' Claims Regarding the Use of the Urner Barry Index in Pricing  22**

   **N.  Coordinated Manipulation of the Urner Barry Benchmark by Dominant Egg Producers Is Accomplished Through Self Reporting** ...................................... 23

   **O.  Concerns Regarding the Urner Barry Index as a Feedback Mechanism As Expressed By a United States Senator and the New York Attorney General** ................... 24

   **P.  Limitations and Manipulation of the Urner Barry Index** ........................... 25

   **Q.  Impact of Reliance on a Single Price Discovery System** .............................. 26

      1.  Evidence of Defendants' Conspiracy Through Contract Farmer Payments ................. 28

**R. Farm Action's Analysis and Evidence of Defendants' Conspiracy** ............................ **28**
   1. Farm Action's Observations on Market Irregularities ............................. 28
   2. Plaintiff's Claims are Evidenced in Contract Farmer Payments ..................... 29

**S. Additional Evidence of Market Manipulation and Anticompetitive Practices** .......... **29**

**T. The Fact That the DOJ's Antitrust Investigation Caused Egg Prices To Drop Is Further Evidence of the Defendants Unlawful Market Manipulation** ............................... **30**
   1. Defendants Slowed the Restoration of Egg Production, Using AI as Pretext to Engineer a False Impression of Scarcity ......................................................... 31

**U. Industry Protocols for Responding to Avian Influenza Outbreaks** ......................... **33**

**V. Historic Market Response to Rising Prices During Avian Flu Epidemics** ................. **34**

**W. Alleged Collusion to Restrict Flock Expansion and Maintain High Prices** .......... **35**

**X. The Avian Influenza Did Not Create a Severe Egg Shortage** ........................................ **35**

**Y. The Sharp Rise in Egg Prices Since 2022 Cannot Be Blamed on Avian Flu or Other Economic Factors** ...................................................................................................................... **37**

**Z. The Avian Flu Is Largely Regional Egg Prices In The Southeast Demonstrate That Pricing During The Relevant Period Did Not Respond To Regional Supply And Demand Dynamics** ...................................................................................................................................... **40**

**AA. Defendants' Conspiracy Led To Huge Profits** ............................................................... **42**

**BB. Plus Factors Corroborate Defendants' Conspiracy to Fix Shell Egg Prices** .......... **43**
   1. Defendants Acted Against Their Own Interest .................................................... 44
   2. Market Concentration and Defendants' Dominance in the U.S. Egg Industry ............... 45
   3. Defendants Regularly Participate in Shared Activities Ripe for Collusion ................. 46
   4. Egg Industry Has Formidable Entry Barriers ....................................................... 47
   5. Inelastic Demand for Conventional Eggs ............................................................. 48
   6. Standard Eggs Exhibit Significant Interchangeability ......................................... 49
   7. Defendants are Recidivist Antitrust Violators ..................................................... 50

***ANTICOMPETITIVE EFFECTS*** ......................................................................................... **51**

***CLASS ACTION ALLEGATIONS*** ........................................................................................ **51**

***CLAIM FOR RELIEF*** ............................................................................................................... **53**

***PRAYER FOR RELIEF*** ............................................................................................................ **54**

***JURY TRIAL DEMAND*** ........................................................................................................... **55**

Plaintiff YELL-O-GLOW CORPORATION, individually and on behalf of all others similarly situated, brings this class action complaint against Defendants Cal-Maine Foods, Inc. ("Cal-Maine"), Daybreak Foods, Inc. ("Daybreak"), Hillandale Farms Corp. ("Hillandale Farms"), Rose Acre Farms, Inc. ("Rose Acre"), and Versova Holdings, LLC (collectively, "Versova"). For ease of reading, Cal-Maine, Daybreak, Hillandale Farms, Rose Acre, and Versova, and will collectively be referred to as "Defendants".

Plaintiff seeks treble damages, injunctive relief, and other relief, for Defendants' *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

Plaintiff alleges, based on personal knowledge as to the facts pertaining to itself, on the investigation of counsel, and on information and belief for all other allegations, as follows.

## **INTRODUCTION**

1.     The Defendants, who are principal producers of conventional shell eggs ("Conventional Eggs" or "Eggs") in the United States have participated in a *per se* unlawful agreement to fix and elevate prices to artificial levels across the United States, including within the Northern District of Illinois.

2.     The Conventional Egg market is perfectly conditioned for collusion. As a commodity with inelastic demand, consumers continue purchasing Conventional Eggs even when prices rise, making the market especially susceptible to price manipulation. Control over the market is increasingly concentrated among a small number of large producers, further enabling coordinated actions among competitors. These factors collectively create an environment where collusion is both feasible and potentially lucrative for those involved.

3.     Starting in January 2022, the Defendants unfairly, deceptively and unlawfully monetized an outbreak of Avian Influenza ("AI") by engaging in a strategic and deliberate price-fixing scheme that was intended to and did, increase Conventional Egg prices to supra-competitive

3

levels.

4.      Each Defendant engaged in a coordinated effort to exploit the avian flu outbreak and inflationary conditions by implementing an unlawful scheme designed to secure extraordinary profits at the expense of members of the Class (as defined below) through the fixing, elevation, and maintenance of supra-competitive prices for Conventional Eggs. In this manner, Defendants adopted a strategy of leveraging the circumstances presented by the crisis to their advantage, a course of action that ultimately proved effective for them.

5.      This instance is not the first occurrence of alleged price-fixing among major conventional egg producers. In 2023, Cal-Maine and other entities were found liable for price fixing by a jury in the Northern District of Illinois. The jury awarded three opt-out plaintiffs' damages, which were trebled to $53 million. See *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, No. 11-CV-8808, 2024 WL 4346418, at *1 (N.D. Ill. Sept. 30, 2024) (Seeger, J.).

6.      The Defendants:

a. did not learn their lesson;

b. again seek to enrich themselves by violating antitrust laws;

c. essentially consider the consequence of an acceptable cost of doing business; and

d. unlawfully categorized violating United States antitrust laws as a profit center.

7.      The Chicago branch of the Department of Justice has issued Civil Investigative Demands to at least the two largest defendants—Cal-Maine Foods and Rose Acre Farms.

8.      The Chicago Field Office of the Antitrust Division of the United States Department of Justice ("Chicago DOJ") has undertaken an investigation concerning major producers of conventional eggs. That investigation is ongoing.

9.      The Chicago Department of Justice has formally requested that several other conventional egg producers retain documents related to pricing, production, avian influenza, and

correspondence with Expana, the entity that owns and manages the Urner Barry pricing service.

10.    Since 1946, YELL-O-GLOW has established itself as a reputable and comprehensive wholesale food distributor. Currently under its fourth generation of family leadership, the company offers an extensive selection of more than 4,000 well-known brand products, encompassing dairy, deli meats, produce, and all essentials approved by WIC.

11.    YELL-O-GLOW diligently sources and acquires the products requested by its customers.

12.    YELL-O-GLOW provides direct distribution services to a range of clients, including chain supermarkets, grocery stores, bodegas, convenience stores, catering companies, and restaurants from Monday through Saturday. Additionally, YELL-O-GLOW operates a wholesale cash-and-carry facility, open for customer shopping from Monday to Friday.

13.    Cal-Maine Foods, a publicly traded entity, initially reported its involvement in an April 2025 disclosure to the United States Securities and Exchange Commission. According to the filing: "In March 2025, the Company received a civil investigative demand in connection with a widely publicized investigation by the Antitrust Division of the Department of Justice into the causes behind nationwide increases in egg prices.  The Company is cooperating with the investigation."

14.    Cal-Maine, the leading U.S. producer of conventional eggs, holds approximately 20% of the market share. During the relevant period, Cal-Maine experienced significant financial gains as a direct result of its unlawful increases in egg prices. These unlawful price hikes directly, proximately and unlawfully increased profits and stock value for both Cal-Maine and the other defendants.

15.    Although the Defendants claim that the Urner Barry Egg Index serves as the egg

industry's "independent" pricing mechanism, it lacks independence and does not function as a reliable metric. In fact, during the Class Period, Defendants used their market dominance and control over Urner Barry Egg to raise and keep egg prices artificially high during the Avian Flu outbreak and the Defendants' unlawful conspiracy was effective, causing egg prices to rise sharply since early 2022.

16.    For instance, the wholesale price of Grade-A Large White Shell Eggs experienced a significant increase, rising from approximately $0.50 to $1.30 per dozen in 2021 to a range of $3.00 to $6.00 per dozen by the end of 2024—representing a more than fourfold growth.

17.    Due to their per se violations of antitrust laws, the Defendants are realizing exceptional profits to the detriment of the Plaintiff and others similarly situated.

18.    Since 2022, Cal-Maine Foods—the only major egg producer obligated to disclose its financial results—has consistently reported quarterly profits that equal or surpass its previous annual profits from the years preceding the avian influenza outbreak. This substantial increase in profitability underscores the financial impact of the elevated egg prices during the period and highlights the outsized gains realized by Cal-Maine as a direct result of the circumstances surrounding the outbreak.

19.    Farm Action, a nonpartisan, farmer-led oversight organization, submitted an appraisal regarding the conduct and pricing activities of major producers in the Conventional Egg market to both the Department of Justice and the Federal Trade Commission.

> "While avian flu has been cited as the primary driver of skyrocketing egg prices, its actual impact on production has been minimal. Instead, dominant egg producers—particularly Cal-Maine Foods—have leveraged the crisis to raise prices, amass record profits, and consolidate market power. The slow recovery in flock size, despite historically high prices, further suggests coordinated efforts to restrict supply and sustain inflated prices."

20.    The Defendants' conspiracy has unlawfully restrained trade in contravention of

Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. As a direct, proximate, and material consequence of these actions, Plaintiff and the similarly situated Class members have paid artificially inflated costs for Shell Eggs. Therefore, Plaintiff and the Class respectfully seek treble damages, injunctive relief, and any other appropriate remedies available as direct purchasers under applicable federal antitrust statutes.

21.    Given that the Northern District of Illinois serves as the venue for the related criminal proceedings, and in light of the rationale behind the United States Department of Justice's selection of Chicago for its prosecutions, the Plaintiff demands a trial by jury in the Northern District of Illinois.

## JURISDICTION AND VENUE

22.    Plaintiff brings its claim under Sections 4 & 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, for Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

23.    There is no dispute that jurisdiction and venue are proper in this court.

24.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 &1337(a).

25.    The Court also has federal question subject matter jurisdiction.

26.    This Court has already exercised personal jurisdiction over Defendants because they have substantial contacts with this jurisdiction and purposefully directed their business activities toward this jurisdiction.

27.    The Chicago Department of Justice initiated, and continues to carry out, its investigation into a new price fixing conspiracy by the defendants within this District, that they willfully began after a jury found Cal-Maine and other entities liable for price fixing by a jury in this jurisdiction and the jury awarded three opt-out plaintiffs damages, which were trebled to $53 million. See *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, No. 11-CV-8808, 2024 WL 4346418, at *1 (N.D. Ill. Sept. 30, 2024) (Seeger, J.) (hereafter for ease of reading "Egg Producers

Guilty Verdict Case".

28.     Venue is proper in the Northern District of Illinois under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22 because during the Class Period, Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District.

## INTERSTATE TRADE AND COMMERCE

29.     Each year, billions of dollars' worth of conventional eggs are produced, sold, distributed, and purchased within interstate commerce in the United States, with both the goods and their corresponding payments traveling across state lines.

30.     The actions of the defendants have directly and negatively affected competition within the United States and its territories.

31.     During the Class Period, the Defendants' actions occurred within the scope of interstate commerce in the United States—including the Northern District of Illinois—and were intended to, and did, significantly affect it.

32.     The Defendants purposefully focused and conducted a willful strategy to influence commerce, including interstate commerce within the United States, by combining, conspiring, or agreeing to fix, maintain, stabilize, or artificially increase the prices for Conventional Eggs.

33.     Throughout the Class Period, each Defendant and/or its affiliates utilized channels of interstate commerce—including railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail—to participate in or further their alleged conspiracy.

34.     Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of Conventional Eggs, the prices of Conventional Eggs would have been determined by a competitive, efficient market.

In the absence of the defendants' alleged combination, conspiracy, or agreement to manipulate the Conventional Egg market, pricing for Conventional Eggs would have been established by a competitive and efficient marketplace.

35.    Defendants' manipulation of the Conventional Egg market had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

## PARTIES

### A.    Plaintiff

36.    Plaintiff YELL-O-GLOW is a Massachusetts based corporation with a principal place of business in Everett, Massachusetts.

37.    The Plaintiff purchased Conventional Eggs directly from one or more Defendants during the Class Period and consequently paid an artificially inflated price for those eggs. As a result, the Plaintiff incurred an ascertainable economic loss.

### B.    Defendants

38.    Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a corporation incorporated under the laws of the State of Delaware, with its principal place of business located in Jackson, Mississippi. Cal-Maine has publicly confirmed its distribution of eggs to customers in the State of Illinois.

The Chicago Department of Justice is actively investigating Cal-Maine in connection with the price-fixing conspiracy described in this Complaint. This investigation focuses on whether Cal-Maine participated in alleged anticompetitive activities affecting the price of Conventional Eggs.

During the Class Period, Cal-Maine engaged in direct sales of eggs to purchasers throughout the United States, including in the Chicagoland area and other regions under the jurisdiction of the Northern District of Illinois Branch of the DOJ. These direct purchasers are considered members of the putative Class involved in this action.

39.    Defendant Rose Acre Farms, Inc. ("Rose Acre") is a corporation incorporated in

Indiana with its principal place of business in Seymour, Indiana. Rose Acre is authorized to conduct business within the State of Illinois and maintains registration for this purpose. The Northern District of Illinois Branch of the DOJ is actively investigating

Rose Acre in connection with the same price-fixing conspiracy described in this complaint. Rose Acre operates egg production facilities in Donovan, Illinois, which is situated within the jurisdiction of the Northern District of Illinois. In addition, Rose Acre manages a facility located in Germantown, Illinois, that is capable of producing more than 700,000 eggs per day.

Throughout the Class Period, Rose Acre engaged in direct sales of eggs to purchasers in the United States, including buyers located in the Chicagoland area. These direct purchasers are similarly situated to other members of the putative Class.

40.     Hillandale Farms Corp. ("Hillandale Farms") is a corporation based in Kent, Ohio. The Northern District of Illinois Branch of the DOJ is currently conducting an investigation into Hillandale Farms regarding the same price-fixing conspiracy outlined in this complaint.

On May 12, 2025, Hillandale Farms was acquired by Global Eggs, S.à r.l., a privately held company headquartered in Luxembourg, for a total purchase price of $1.1 billion. Despite the acquisition, Hillandale Farms continues to operate as an active business entity.

Throughout the Class Period, Hillandale Farms sold eggs directly to purchasers within the United States, including purchasers located in the Chicagoland area. These direct purchasers are considered members of the putative Class in this action.

41.     Defendant Daybreak Foods, Inc. ("Daybreak") is incorporated in Wisconsin and maintains its principal place of business in Lake Mills, Wisconsin. The company is registered to conduct business within the State of Illinois and operates a facility in Grant Park, which falls under the jurisdiction of the Northern District of Illinois.

The Northern District of Illinois Branch of the DOJ is actively investigating Daybreak in connection with the same alleged price-fixing conspiracy described in this complaint. During the Class Period, Daybreak expanded its operations by acquiring a smaller competitor with facilities in Illinois. This acquisition further increased the number of egg-laying hens under Daybreak's management within the state.

Throughout the Class Period, Daybreak engaged in direct sales of eggs to purchasers across the United States, including buyers located in the Chicagoland area. These direct purchasers are considered members of the putative Class in this action.

42.    Defendant Versova Holdings, LLC ("Versova") is a corporation incorporated in Iowa, with its principal place of business located in Sioux Center, Iowa. The company is currently the subject of an investigation by the Northern District of Illinois Branch of the DOJ concerning the same alleged price-fixing conspiracy described in this complaint.

Throughout the Class Period, Versova engaged in the direct sale of eggs to purchasers across the United States, including buyers within the Chicagoland area. These direct purchasers are considered members of the putative Class in this action. The ongoing DOJ investigation is focused on the same conspiracy alleged in this complaint.

43.    Doe Defendants 1-20 are other individuals or entities of unknown places of residence or states or countries of incorporation who engaged in or abetted the unlawful conduct by Defendants set forth in this Complaint. Plaintiff may amend this Complaint to allege the names of additional Defendants as they are discovered.

### C.    Agents and Co-Conspirators

44.    The anticompetitive and unlawful actions described in this Complaint were ordered, authorized, undertaken, directed, or approved by the respective officers, agents, employees, or other authorized representatives of the Defendants during the course of managing,

directing, or controlling the business operations or affairs of the Defendants.

45.     The agents of each corporate Defendant acted pursuant to both the actual and apparent authority conferred by their respective principals.

46.     Each corporate Defendant, along with its subsidiaries, affiliates, and agents, operated as a unified and integrated entity. Each Defendant served in the capacity of principal or agent for other Defendants concerning the acts, alleged violations, and coordinated and common course of conduct described herein.

47.     It is possible that individuals or entities not specifically identified as Defendants in this civil proceeding at this time may have acted as co-conspirators in the unlawful and anti-competitive conduct that violated United States antitrust law in ways that are presently unknown. Furthermore, these parties may have engaged in undisclosed actions or made statements not yet determined that contributed to these activities.

48.     For ease of reading, when the Plaintiff references a corporate family or group of companies by a single designation in allegations regarding participation in the conspiracy, it means that the Plaintiff is asserting that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts or meetings on behalf of all Defendant companies belonging to that family.

**FACTUAL ALLEGATIONS**

**A.      The U.S. Egg Industry**

49.     Eggs constitute an essential component of American diets. In 2024, per capita egg consumption in the United States continued its upward trend, with the average individual consuming approximately 288 eggs annually.

50.     In 2024, egg producers in the United States generated an estimated 258 million cases of shell eggs, equating to more than 7 billion dozen. The overwhelming majority of these

eggs were consumed within the domestic market, with exports accounting for only 5.5 million cases that year.

51.     Eggs are categorized into consumer grades—Grade AA, Grade A, and Grade B—according to defined interior and exterior quality standards. Furthermore, egg sizes are classified by weight per dozen, spanning categories from Jumbo to Small.

52.     The adoption of uniform grading and sizing standards across the egg industry plays a crucial role in ensuring consistency within the marketplace. These standards, enforced by the U.S. Department of Agriculture, dictate the precise quality and size specifications that eggs must meet to be classified under particular categories, such as "Grade A Large."

53.     As a result of these rigorous and standardized criteria, eggs that are labeled as "Grade A Large" from one producer are virtually indistinguishable from those produced by another. This uniformity ensures full interchangeability between products of the same grade and size, regardless of their origin. Consequently, opportunities for product differentiation based on quality or size are significantly minimized, reinforcing the commodity-like nature of eggs within these defined categories.

54.     The U.S. Department of Agriculture has recognized eggs as "among the most nutritious foods on earth." Similarly, the American Heart Association describes eggs as "an efficient, rich source of protein and vitamins" that support healthy metabolism, liver function, and fetal brain development.

55.     The U.S. Department of Agriculture has recognized eggs as "among the most nutritious foods on earth." This acknowledgment highlights the broad spectrum of essential nutrients that eggs provide. Not only are eggs an important dietary staple, but they are also valued for their exceptional nutrient density.

56.     Furthermore, the American Heart Association describes eggs as "an efficient, rich source of protein and vitamins." This assessment underscores the role of eggs in supporting several key bodily functions. Consuming eggs contributes to a healthy metabolism, assists in proper liver function, and plays an important role in fetal brain development. These attributes reinforce the significance of eggs as a beneficial component of a balanced diet.

57.     Egg production is characterized by two related sectors—the "shell egg" sector and the "egg products" sector.

58.     The shell egg sector primarily produces "table eggs" intended for immediate consumption. These eggs are typically sold in cartons to grocery stores for retail distribution to consumers. Additionally, restaurants, hotels, and other food service establishments purchase shell eggs for their operations. The shell egg sector also supplies "breaking eggs" to the egg products industry, where they are processed into various egg-based products.

59.     The shell egg sector predominantly produces "table eggs" for immediate consumption, which are commonly packaged in cartons and distributed to grocery stores for retail sale. Food service entities such as restaurants, hotels, and similar establishments procure shell eggs to support their operations. This sector also supplies "breaking eggs" to the egg products industry, where these eggs undergo processing into a variety of egg-based products.

60.     Within the broader shell egg market, there is a growing niche segment dedicated to specialty products, such as cage-free and organic eggs. These products typically fetch higher retail prices compared to conventional eggs. Cage-free eggs are produced by hens that are kept indoors but are allowed to move freely, which enables them to exhibit more natural behaviors. Despite the rising consumer interest in more humane production practices, conventional eggs continue to dominate the market and account for roughly 70% of all shell egg production in the United States.



**B.    Shell Egg Production**

61.    The egg industry predominantly consists of vertically integrated producers, such as the Defendants, who maintain significant control and dominance over each phase of production. This extensive oversight enables them to micromanage each aspect of the production process and to artificially manipulate pricing to increase their profits and stock value

62.    For example, molting is a way for a producer to control the supply of eggs.

63.    Commercial shell egg production begins at large laying facilities where specialized breeds of laying hens are bred and raised. Once the layer chicks, commonly known as pullets, are hatched, they are placed in layer pens or in pullet houses.

64.    Commercial shell egg production is initiated at large-scale laying facilities, where breeds of hens specifically selected for egg production are bred and reared. Following hatching, the layer chicks, referred to as pullets, are housed in designated layer pens or pullet houses.

65.    Egg production within a flock typically begins when the hens reach 18 to 22 weeks of age. At this initial stage, only about 10% to 20% of the hens have started laying eggs. As the flock matures, production gradually increases, reaching its peak of approximately 90% at 30 to 32

weeks of age. After peaking, the rate of egg laying begins to decline. By the time the hens are 60 to 70 weeks old, overall flock production falls to around 50%.

66.    Molting is a natural occurrence in hens, typically taking place when daylight hours decrease during the fall. During this period, hens notably reduce their feed consumption, cease egg laying, and shed and regrow their feathers. In commercial egg production, producers can induce molting artificially by restricting or withdrawing feed and carefully managing light exposure. This process is used to control the timing and efficiency of egg production within the flock.

67.    Approximately ten weeks after molting begins, the flock's egg production increases and stabilizes at about 50%. Following a molt, production peaks briefly at around 80%, after which it gradually declines and generally returns to about 50% at 100 to 110 weeks of age.

68.    Most hens are removed from production between 100 and 130 weeks, at which point they are sent to a spent-hen facility. Mature pullets are then introduced to the flock, ensuring a continuous cycle of renewal within the production system.

69.    Shell eggs are typically collected using nylon belts and transported to either a storage cooler or an egg processing facility. Within approximately 12 to 14 hours after laying, eggs generally reach the processing center, where they undergo washing, inspection for shell defects, cracks, and blood spots, and subsequent grading for packaging. At this stage, eggs are either packaged into cartons for retail distribution or designated for additional processing.

70.    After packaging, shell eggs are transferred to a refrigerated facility for storage until they are ready for distribution to retail outlets or food processing companies. Producers typically supply eggs to buyers within one week of the laying date.

### C.    The Urner Barry Egg Index

71.    Unlike other agricultural commodities such as coffee, soy, and sugar, the egg market does not operate through a regulated exchange where prices are transparently established

via open trading. Instead, the primary avenue for spot transactions is the Egg Clearinghouse Inc. ("ECI"). ECI functions as an online spot market, enabling producers to sell surplus eggs or to purchase additional inventory when they need to fulfill extraordinary contractual requirements.

72.    The Egg Clearinghouse, Inc. (ECI) was founded in 1971 by Fred Rogers Adams, Jr., who also established Cal-Maine.

73.    Cal-Maine and the Adam's family have sustained a close relationship with The Egg Clearinghouse, Inc. (ECI) over the years. This connection is exemplified by the involvement of family members in key leadership positions within both organizations.

74.    Fred Rogers Adams' son-in-law, Adolphus B. Baker, has played a significant role in Cal-Maine's leadership, serving as Chairman since 2012. Prior to his appointment as Cal-Maine's Chairman, Adolphus B. Baker held the position of Chairman at ECI. His ongoing direct contributory relationship to ECI is further demonstrated by his continued service on ECI's board.

**D.    Role and Scope of ECI in the U.S. Egg Market**

75.    Although ECI operates as the main online spot market for shell eggs, it accounts for less than 5% of total egg transactions in the U.S. market.

76.    As a result, the vast majority of egg sales occur outside of the ECI platform, typically through long-term contracts between producers and buyers.

77.    These contracts often rely on other pricing benchmarks and negotiation mechanisms, rather than spot market transactions.

78.    The limited share of ECI in overall egg trading highlights its specific function as a venue for managing surplus inventory and extraordinary purchase needs, rather than serving as the primary channel for routine egg sales.

**E.    Expana and Urner Barry**

79.    Most shell eggs are sold through long term contracts between producer firms, such

as Defendants, and chain buyers, with prices being set based on weekly wholesale quotes published by Urner Barry, an industry consulting and data analytics firm.

80.    Consequently, the prices in these contracts fluctuate frequently because they are tied to changes in the Urner Barry index. This widely used pricing benchmark enables Defendants to coordinate and influence egg prices across the industry, facilitating market-wide price manipulation.

81.    Urner Barry is now owned by Expana.

82.    Expana describes itself as "the world's leading agrifood-focused Price Reporting Agency and global information provider".

83.    Expana publishes the Egg Price Current Report, commonly known as the UB Index.

84.    The Expana Egg Price Current Report, or UB Index, offers standardized pricing for various egg grades and sizes, with Grade A Large being the most frequently traded.

85.    Urner Barry constructs the widely used price index, claiming to derive these prices by observing the small spot market through ECI and gathering price data directly from egg producers, distributors, exporters, and buyers.

**F.    Shell Egg Pricing and the Role of Urner Barry and Expana**

86.    In the U.S. shell egg market, the majority of eggs are not sold on open spot exchanges but rather through long-term contracts established between producer firms—such as the Defendants—and chain buyers.

87.    The pricing for these contracts is typically set according to weekly wholesale price quotations published by Urner Barry, a well-known industry consulting and data analytics firm.

88.    This arrangement results in contract prices that fluctuate regularly, as they are directly linked to the changes in the Urner Barry index.

89.    The widespread reliance on the Urner Barry index as a pricing benchmark enables

industry participants, including the Defendants, to coordinate and potentially influence egg prices on a broad scale. As a result, the use of this benchmark has facilitated market-wide price manipulation.

90.     Urner Barry is now owned by Expana, which describes itself as "the world's leading agrifood-focused Price Reporting Agency and global information provider." Expana is responsible for publishing the Egg Price Current Report, which is commonly referred to as the UB Index. This report provides standardized pricing information for a variety of egg grades and sizes, with Grade A Large eggs being the most frequently traded category.

91.     To construct the widely used price index, Urner Barry claims to utilize data collected from two primary sources: observations of the limited spot market activity conducted through the Egg Clearinghouse Inc. (ECI), and direct price reporting from egg producers, distributors, exporters, and buyers. This combination of spot market observations and direct industry reporting forms the foundation for the pricing benchmarks that underpin the majority of contractual egg sales in the United States.

### G.     Urner Barry's Benchmark Pricing Methodology

92.     Urner Barry asserts that it synthesizes the collected data points into "benchmark" prices, which are published in its UB Index. This index is then sold primarily to the same industry participants—such as egg producers, distributors, and buyers—who initially provided the underlying pricing information. These entities, in turn, rely on the UB Index to establish the pricing terms in their contracts with customers.

93.     To develop these benchmark prices, Urner Barry obtains information from egg producers through a variety of channels. These include phone interviews, face-to-face meetings, email correspondence, instant messaging platforms, fax, and online submissions via Urner Barry's website. The scope of the information collected is comprehensive and covers multiple aspects of

each transaction. Specifically, Urner Barry gathers details such as the timing of when a transaction was initiated, the specific products traded, the bid levels for each product, the identities of the parties bidding or offering at each price level, expected shipping dates, and the manner in which products are packaged.

94.     Urner Barry collects a variety of information regarding "bona fide trades," offers and bids, and other market communication by communicating directly with egg producers like Defendants.  Notably, "[o]ffering prices cannot be used to move prices upward, nor can bid prices be used to move prices downward."

95.     Urner Barry then publishes a daily retail shell egg price "quotation" that it claims reflects the information provided to it.

96.     Throughout the Class Period, the Urner Barry reporters that cover the shell-egg market have been Karyn Rispoli, Randy Pesciotta, and Russ Whitman.

### H.     Overview of the Avian Influenza

97.     Avian influenza (AI) is a viral respiratory disease that affects all species of birds. The disease was first described as "fowl plague" in Italy in 1878, marking its initial recognition in the scientific community. In the United States, the earliest reported cases of avian influenza emerged in the 1920s.

98.     The severity of avian influenza infections is categorized according to their pathogenicity. Cases are classified as either highly pathogenic avian influenza (HPAI) or low pathogenic avian influenza (LPAI), based on the level of illness they cause in affected birds.

### I.     Impact and Timeline of the 2022 Avian Influenza Outbreak

99.     The 2022 avian influenza outbreak was triggered by highly pathogenic avian influenza (HPAI), with the H5N1 strain identified as the primary cause.

100.     This particular strain affected both wild and domesticated bird populations. The

outbreak commenced in January 2022, when the virus was first detected in wild birds in South Carolina.

101.    By February 2022, the epidemic had spread to commercial laying facilities, resulting in fourteen additional detections within the same month.

**J.    Egg Prices**

102.    Historically, eggs have been an affordable source of animal-based protein.

103.    As detailed above, since the 2022 avian flu outbreak, wholesale prices for Grade-A, Large, White, Shell Eggs have quadrupled.

104.    While there was a slight decline durig the class period, the "trend" reversed by August 2024, with prices climbing again to $3.00–$6.00 per dozen by year-end.

105.    As of March 2025, the national index for weekly egg prices reached an all-time high of $8.17 per dozen.

**K.    The Historical Affordability and Recent Artificially Inflated Price Trends in Eggs**

106.    Eggs have long been recognized as an economical source of animal-based protein for households across the United States. Traditionally, their affordability has made them a dietary staple for many consumers.

107.    However, following the 2022 outbreak of avian influenza, there was a dramatic escalation in wholesale prices for Grade-A, Large, White, Shell Eggs, with prices quadrupling compared to previous years.

108.    Although prices experienced a modest decline during the class period, this trend reversed by August 2024.

109.    Egg prices began to rise once more in August 2024, reaching a range of $3.00 to $6.00 per dozen by the end of 2024.

110.    The upward trajectory continued into 2025.

111.    By March of that year, the national index for weekly egg prices soared to an unprecedented high of $8.17 per dozen, marking the highest level recorded to date.

**L.    The Dramatic Surge in Egg Prices is a Result of Defendants' Unlawful Conspiracy and Per Se Violations of United States Antitrust Law**

**1.    Defendants Use the UB Index to Price Eggs and as a Scapegoat**

112.    In a FAQs page created by Cal-Maine in response to consumer outrage over high egg prices, Cal-Maine claimed that they had no power over pricing because their "eggs are typically priced under specific customer agreements, a majority of which are tied to the independently quoted Urner Barry egg price index, and thus only change when Urner Barry's quoted index price changes."

113.    Cal-Maine's annual SEC filings during the Class Period confirm that "the majority of conventional shell eggs sold in the U.S. … are sold at prices that take into account … quoted wholesale market prices, such as those published by Urner Barry."

114.    When responding to a 2020 lawsuit filed by the New York Attorney General for alleged price gouging during the COVID-19 pandemic, Hillandale Farms formally represented that their pricing approach had been "consistent for decades" and that they relied on "a third-party company known for market reporting in the food industry and that companies name is Urner Barry".

115.    Based on information and belief, all Defendants contribute to and otherwise use the UB Index as the pricing benchmark for their wholesale rates in long-term contracts.

**M.    The Defendants' Claims Regarding the Use of the Urner Barry Index in Pricing**

116.    All Defendants contribute to and otherwise use the UB Index as the pricing benchmark for their wholesale rates in long-term contracts

117.    In response to widespread consumer concerns about escalating egg prices, Cal-Maine published a FAQs page addressing their approach to pricing. In its FAQ, Cal-Maine knowingly, deceptively and falsely asserted that they lacked control over pricing, emphasizing that their eggs are "typically priced under specific customer agreements, a majority of which are tied to the independently quoted Urner Barry egg price index, and thus only change when Urner Barry's quoted index price changes."

118.    Further reinforcing this statement, Cal-Maine repeated and marketed this knowing, deceptive and false assertion in its annual SEC filings during the Class Period when it published that "the majority of conventional shell eggs sold in the U.S. … are sold at prices that take into account … quoted wholesale market prices, such as those published by Urner Barry."

119.    Similarly, Hillandale Farms, when confronted with a 2020 lawsuit brought by the New York Attorney General alleging price gouging during the COVID-19 pandemic, knowingly, deceptively and falsely asserted that their pricing methodology had "been consistent for decades." They explained that their pricing depended on "a third-party company known for market reporting in the food industry and that company's name is Urner Barry."

120.    Defendants wrongfully and falsely allege that use the purported independent third-party UB Index as the basis for their wholesale pricing in long-term contracts.

121.     Defendants knowingly, deceptively and falsely shift blame to the UB Index to hide their unlawful anti-competitive conduct including that during the Class Period.

**N.    Coordinated Manipulation of the Urner Barry Benchmark by Dominant Egg Producers Is Accomplished Through Self Reporting**

122.    Urner Barry, a widely recognized market reporting firm in the food industry, relies on voluntary data submissions from major participants within the egg market to compile its price quotations and indexes.

123.    This structure provided the leading egg producers, who are also Defendants in this matter, with a unique opportunity to exert influence over the benchmark prices.

124.    During the Class Period the Defendant major conventional egg producers were able to leverage their dominant market positions to affect the outcome of the Urner Barry Index.

125.    By willfully, deceptively and unlawfully altering and managing the information they reported—such as inventory levels, asking prices, and purported transaction values—the Defendants constructed an artificial impression of egg scarcity and simultaneously inflated the perception of demand.

126.    Notably, these actions were carried out even when actual supply conditions in the market did not warrant such elevated pricing.

127.    This manipulation of market data allowed the Defendants to create a misleading narrative regarding the availability and demand for eggs.

128.    Through these coordinated and unlawful practices—including both active misrepresentation and failures to act lawfully—the Defendants succeeded in unlawfully increasing the Urner Barry benchmark price.

129.    The artificially raised benchmark, in turn, directly elevated prices in contracts that were indexed to Urner Barry, as well as in spot market transactions. The ripple effect of these actions resulted in higher egg prices throughout the market, to the detriment of buyers and consumers.

**O.    Concerns Regarding the Urner Barry Index as a Feedback Mechanism As Expressed By a United States Senator and the New York Attorney General**

130.    Further highlighting the issues with the Urner Barry (UB) Index, the New York Attorney General, in litigation against Hillandale Farms for alleged price gouging during the pandemic, underscored that the UB Index operates as a feedback loop. In this structure, producers'

own reported data are used to set wholesale egg prices, allowing those same producers to influence the benchmark that determines market pricing.

131.    This concern was echoed by U.S. Senator Jack Reed and other observers, who have noted that industrial egg producers appear to be crafting a misleading narrative about the causes of high egg prices in the United States. According to Senator Reed, these actions are aimed at compelling consumers and retailers to pay more for eggs than what competitive market conditions would justify. He emphasized that, because the wholesale price of eggs is pegged to the Urner-Barry Index, the largest dozen egg producers possess the ability to contribute data to the index in ways that may result in pricing that is particularly advantageous for the industry itself.

132.    As a result of their unlawful strategies coupled to thier significant market presence as the major egg producers in the U.S. market, the Defendants unlawfully wielded influence over the UB price index.

133.    As referenced herein, during the Class Period, Defendants leveraged the bird flu outbreak as a pretext to drive prices beyond competitive levels.

134.    As the Urner Barry egg price index increased, so did their prices in contracts signed with egg buyers, creating a self-reinforcing upward price spiral driven by their coordinated actions.

**P.    Limitations and Manipulation of the Urner Barry Index**

135.    Over time, the Urner Barry (UB) Index has consistently failed to represent the genuine market value of eggs. Instead, it has disproportionately relied on daily self-reported inventory figures from the largest egg producers. This methodology has led to significant issues in price discovery and transparency within the industry.

136.    A 1984 publication from the Cornell Agricultural Economics Staff Paper, entitled "Urner Barry Shell Egg Quotes: How Good Are They?", highlighted that the data provided by egg producers to Urner Barry were "based principally on verbal descriptions of market conditions

25

rather than on actual transaction prices."

137.    The research further noted that, although spot quotes, ECI prices, and military sales were considered, Urner Barry did not assign significant weight to these sources. As a result, Urner Barry's quoted prices consistently "drift[ed] above actual exchange prices."

138.    The study found that Urner Barry reporters were frequently influenced by egg producers to maintain price stability. This practice resulted in quoted prices that diverged from efficient market-clearing prices and demonstrated a tendency for prices to adjust upwards more swiftly than they declined.

139.    During the relevant period, Defendants exploited their market power and took advantage of disruptions caused by avian influenza to drive egg prices—and consequently their profits—even higher. Notably, Farm Action recently disclosed that egg companies have not replenished their flocks at the same rate following the recent bird flu outbreak as they did in the aftermath of the 2014-2015 outbreak.

140.    The actions of the Defendants during the Class Period are evident in the prevailing market prices as reflected in the UB Index. These prices have diverged markedly from actual market conditions, particularly from basic supply-and-demand fundamentals.

141.    As the leading industry commentator Simon M. Shane pointed out, reliance on a single commercial price discovery system "constitutes an impediment to a free market." Here it allows Defendants, the largest-volume producers, to manipulate the market price.

### Q.    Impact of Reliance on a Single Price Discovery System

142.    Egg Industry expert Simon M. Shane opined that depending exclusively on one commercial price discovery mechanism poses a significant barrier to the functioning of a free market. Plaintiff alleges that this, the other factors referenced herein, and  others to be uncovered or better evidenced through discovery and deep dive expert analysis enabled the Defendants in this

case—to exert unlawful influence over market pricing. By controlling the central reference point for egg prices, these major producers were and continue to be positioned to manipulate the market to their advantage, further distorting true supply-and-demand dynamics. The fact they did so while under this Court's scrutiny as relates to the jury findings in the Egg Producers Guilty Verdict Case, is both unbelievable, unacceptable and abhorrent to the rule of law.

143.    On January 12, 2023, Urner Barry analyst and editor of Urner Barry's *Egg Price Current* Karyn Ripsoli, went on record and confirmed on high egg prices, which saw nine weeks of consecutive growth, saying that "the market is undergoing a correction… [b]ut given the heights from which we are adjusting, the declines have been rather precipitous. Over the past two weeks, prices have plummeted $1.13/dozen, or 20.7% (as of January 10). And based on negotiated trade values in the spot market, there's still quite a bit of adjusting that needs to take place."

144.    The fact that prices rose for nine straight weeks and then fell over 20% in two weeks is evidence that prices were artificially pushed too high as does spot trades being lower than the quoted benchmark.

145.    Farm Action is an egg farmers' advocacy group.  Joe Maxwell is the co-founder of Farm Action. Joe Maxwell's observations that "[w]e do not see the supply and demand numbers that justify the prices being charged" and "[t]he minute we see a market not responding the way it should, that's a flag for us to say, 'OK, what is going on here?' Because the market dynamics, the basic laws of economics, are not working" lend support to Plaintiff's position.

146.    Defendants' conspiracy is further evidenced by the prices they paid to their contracted farmers.

147.    Farm Action released the documentation it obtained from a farming family with a long-standing contract with Cal-Maine.

1. **Evidence of Defendants' Conspiracy Through Contract Farmer Payments**

148.    The documentation revealed that Cal-Maine did not use the UB index as a benchmark for their own contract farmer payments.

149.    As a result, farmers were denied the opportunity to benefit from Cal-Maine's soaring profits.

150.    Despite the outbreak of avian flu, contract farmers received only a $0.0125 per dozen increase compared to six years ago.

151.    As of early 2025, farmers were paid $0.2675 per dozen eggs, while Cal-Maine and other defendants charged customers around $6 per dozen.

152.    The fact that the Urner Barry Index is subject to manipulation has been known for many years.

**R.    Farm Action's Analysis and Evidence of Defendants' Conspiracy**

1. **Farm Action's Observations on Market Irregularities**

153.    Farm Action, an advocacy group representing egg farmers, has played a key role in highlighting discrepancies in the egg market during the Class Period. Joe Maxwell, the co-founder of Farm Action, provided critical insights supporting the Plaintiff's allegations. Maxwell observed, "We do not see the supply and demand numbers that justify the prices being charged," and further noted, "The minute we see a market not responding the way it should, that's a flag for us to say, 'OK, what is going on here?' Because the market dynamics, the basic laws of economics, are not working." These statements reinforce the position that egg prices have not reflected traditional supply-and-demand principles, and support Plaintiff's position that the market has been artificially and unlawfully manipulated by the Defendants.

### 2. Plaintiff's Claims are Evidenced in Contract Farmer Payments

154. Additional evidence of the Defendants' conspiracy available at this early stage is found in their treatment of contract farmers. Farm Action released documentation obtained from a farming family with a long-standing contract with Cal-Maine, one of the Defendants. An objective reading of records establishes that Cal-Maine did not use the Urner Barry (UB) Index as a benchmark to determine payments to their contract farmers. While retail prices for eggs soared, the payments to contract farmers remained unchanged. Despite the factors the Defendant's relied upon to justify their staggering price increase, their payments to contract farmers essentially remained the same as farmers only received a $0.0125 per dozen increase over the past six years.

155. Through to the beginning of 2025, contract farmers – the ones producing eggs and carrying great cost and risk - were paid $0.2675 per dozen eggs while Cal-Maine and other Defendants were charging customers over 22 times more, or about $6 per dozen eggs at the same time. It is certainly noteworthy that this stark contrast demonstrates that the profitability from high market prices did not translate into increased compensation for those actually carrying the cost of producing the eggs.

### S. Additional Evidence of Market Manipulation and Anticompetitive Practices

156. Additional evidence substantiates the assertion that the system in question enabled manipulation of the Urner Barry Index during the class period.

157. For example, the fact that the Urner Barry Index has been highlighted by industry observers for many years, lends further credence to the allegations of anticompetitive conduct and market distortion.

158. A further example is evidenced through the significant antitrust lawsuit filed in 2017 by major retailers such as Kroger and Albertsons against broiler chicken producers, the plaintiffs alleged that the defendants directly influenced Urner Barry's price calculations.

According to their claims, the defendants submitted misleading or selective pricing data and applied pressure on a key Urner Barry executive to artificially raise reported prices. The Kroger and Albertsons litigation resulted in over $280 million in settlements to date, underscoring the seriousness of the impact that the unlawful manipulation of egg industry benchmarks has on the market, including the Plaintiff and other similarly situated members of the class.

### T.    The Fact That the DOJ's Antitrust Investigation Caused Egg Prices To Drop Is Further Evidence of the Defendants Unlawful Market Manipulation

159.    On March 7, 2025, the Chicago office of the U.S. Department of Justice (DOJ) Antitrust Division announced the initiation of a preliminary investigation into a new round of possible collusive practices among major egg producers, including Defendants Cal-Maine and Rose Acre. The focus of the investigation was to determine whether these companies had conspired to restrict the supply of shell eggs and inflate prices.

160.    Following the announcement of the DOJ investigation, market dynamics shifted notably when the Urner Barry industry pricing index, reported a dramatic decline in egg prices. More specifically, the price of eggs fell by 54% within a span of four weeks during that same month. The fact that this significant price drop is directly related to the of the DOJ's announcement of a probe into the new round of possible collusive practices among major egg producers is made more likely than not because there was no other factor that would have impacted the price of eggs that dramatically in play at that time and the Defendant's contemporaneously offered no credible rationale supporting the rock dropped from a plane decrease.

161.    The rapid and substantial decrease in prices prompted scrutiny from economic experts.

162.    Economist David Anderson observed that the ease and speed with which prices fell suggested they were previously maintained at artificially high levels. Anderson's analysis supports

the allegation that the elevated prices were not justified by market fundamentals, but rather were the result of coordinated actions among the Defendants. This reinforces the broader claim of a conspiracy to manipulate the egg market, as alleged by the Plaintiffs.

### 1. Defendants Slowed the Restoration of Egg Production, Using AI as Pretext to Engineer a False Impression of Scarcity

163.    Further evidence indicates that the Defendants maintained a consistent egg inventory during the Class Period and engaged in unlawful, coordinated reporting practices that artificially raised the Urner Barry benchmark and that the Defendant's attempt to justify these high prices by arguing that the Avian Flu was affecting egg price was false, unfair, deceptive, wrongful and unlawful.

164.    Corporate filings and data from the U.S. Department of Agriculture indicate that the Defendants increased prices to levels exceeding those required to offset costs associated with the outbreak. Overall, in addition to the fact that payments to the growers establish little to no impact at all, reductions in egg production were less significant than the Defendants have portrayed.



165.    The USDA reported that egg prices rose more than production dropped during the outbreak. In 2022, the monthly U.S. egg-laying flock was never more than 6.7% below the five-year average, and egg production never fell over 5.6%. The month before the first commercial flock case, national retail egg inventories were 22% higher than the four-year average.

166.    Between 2022 and 2025, U.S. per capita egg production consistently exceeded per capita consumption. Although bird flu was cited as a reason for higher prices, Cal-Maine reported no cases until December 2023 and sold 7% more eggs from June 2022 to May 2023 than in 2021.

167.    An Urner Barry analyst hinted that the real reason for high shell egg prices is that the Defendants are taking advantage of the "psychology" of the general public's awareness of the bird flu outbreak, rather than true economics, and were "confident about the value they can offer to the market."

168.    When egg prices dropped to a five-month low in May 2025, Brett House, an economics professor at Columbia Business School, told CBS MoneyWatch that one of the main

drivers behind the drop was an "abatement in the conversation about bird flu.", not that actual bird fly.  Professor House went on to add that "egg prices are still substantially higher than they were 12 months ago."

### U.    Industry Protocols for Responding to Avian Influenza Outbreaks

169.    The U.S. egg industry has developed a well-established and efficient protocol for responding to Avian Influenza (AI) outbreaks, drawing from extensive prior experience. Once AI is confirmed by the appropriate authorities, the affected facility is immediately placed under quarantine to prevent further spread of the disease. This initiates a standardized response process designed to contain and eradicate the outbreak as swiftly as possible.

170.    The standard protocol begins with the depopulation of infected flocks, removing all hens from the premises to eliminate the source of infection. Following depopulation, the next step involves the proper disposal of carcasses, ensuring that potentially contaminated material is handled in accordance with safety guidelines. Thorough cleaning of the facility is then conducted to remove all organic material and potential pathogens. After cleaning, the premises undergo a comprehensive disinfection process, further reducing the risk of any lingering virus particles.

171.    Upon completion of these critical steps, the quarantine is lifted by authorities, allowing the facility to resume operations with minimal delay. This structured approach enables producers to quickly return to normal production levels following an outbreak, minimizing the impact on supply and market stability.

172.    An example of this protocol in practice can be seen at a facility impacted in March 2025 and normal operations were restored within approximately six weeks of the outbreak, objectively establishing the effectiveness of the industry's established response procedures.

- March 12        Infection officially confirmed

- March 13        Depopulation of 47,653 hens completed

- March 20        Disposal completed

- April 2         Cleaning of the premises completed

- April 4         Disinfection of the premises completed

- April 20        Quarantine lifted

173.    This pattern played out clearly during the 2014–2015 avian flu epidemic, when producers lost over 35 million hens to HPAI-related cullings but managed to fully replenish their flocks within eight months. Although the outbreak initially caused prices to rise due to supply shortages, the swift replenishment of flocks led to a rapid rebound in egg production, driving prices down sharply in 2016—to levels even lower than those before the epidemic.

**V.    Historic Market Response to Rising Prices During Avian Flu Epidemics**

174.    In a competitive market, rising prices instruct producers to swiftly increase their output in order to benefit from higher profits. This behavior is driven by the incentive to maximize earnings before increased supply eventually causes prices to fall. As producers respond to higher prices by ramping up production, the market gradually stabilizes; the boost in supply helps restore balance between supply and demand over time.

175.    This dynamic was evident during the 2014–2015 avian flu epidemic. Although producers lost over 35 million hens due to HPAI-related cullings, they were able to replenish their flocks within eight months, and the rapid recovery of the flocks resulted in a quick rebound in egg production. Consequently, egg prices were sharply driven down in 2016, dropping to levels even lower than those seen before the outbreak. This example illustrates how competitive market forces act to mitigate supply shocks and restore price stability following a disruption.

176.    As Cal-Maine had stated, "[i]n the past, during periods of high profitability, shell

egg producers have tended to increase the number of layers in production with a resulting increase in the supply of shell eggs, which generally has caused a drop in shell egg prices until supply and demand return to balance."

### W.    Alleged Collusion to Restrict Flock Expansion and Maintain High Prices

177.    The Market response during the Class Period stands in stark contrast to the norm because the Defendants engaged in a coordinated effort to prevent the expansion of their egg-laying flocks and deliberately creating a false perception of an egg shortage.

178.    The monthly reduction in the egg-laying flock size since 2022 was similar to 2015, when the HPAI destroyed 43 million-egg laying hens with one glaring artificially created exception - prices since 2022 have risen more than three times more per hen loss than they did during the 2015 outbreak.

179.    Upon information and believe, the Plaintiff alleges that the Defendants entered into an agreement to restrict output that resulted in the egg-laying flock struggling to return to its pre-outbreak size of approximately 330 million hens, despite persistently high prices.

180.    Moreover, this time, rather than increasing pullets, Defendants put about 20 million fewer pullets in play, despite the fact that breeders and hatchers produced more fertilized eggs. Add to that the fact that related costs have gone down significantly since 2022. Obviously, this drastic slowdown contributed to a manufactured perception of egg scarcity and as a result, these actions have reinforced and prolonged the perception of an egg shortage, further supporting persistently high prices.

### X.    The Avian Influenza Did Not Create a Severe Egg Shortage

181.    Defendants have frequently pointed to avian flu as the primary reason for the dramatic increases in egg prices. However, the actual impact of the virus on egg production was capped quickly and otherwise limited. While it is true that, since the 2022 avian flu outbreak,

approximately 144 million hens have been culled or have died due to the virus, this figure does not represent a sudden, catastrophic loss to the national flock.

182.    If all 144 million hens—almost 40% of the nation's total flock—had been removed at the same time, the effects would have been significant and would have led to a genuine shortage – but this did not happen. The recent cullings were distributed over a period of more than three years with up to eleven months between outbreaks.

183.    This gradual pace of culling has minimized the overall impact on supply, preventing the kind of acute shortage that would justify the steep rise in prices.



184.    USDA inventory data indicate that the U.S. egg-laying hen flock declined slightly after the bird flu outbreak—by 3.82% in 2022, 3.16% in 2023, and 5.18% in 2024 compared to 2021. In 2022, this equaled roughly 3.5 million fewer hens, a 1% drop from 2021. Despite this modest decrease, average wholesale egg prices rose sharply: 127% in 2022, 54.6% in 2023, and 127.7% in 2024 versus 2021.

185.    Despite a smaller flock, domestic egg supply barely declined thanks to lower exports and higher laying rates per hen. Egg production decreased slightly from 8.1 billion per

month in 2021 to 7.75 billion in December 2024.

### Y.    The Sharp Rise in Egg Prices Since 2022 Cannot Be Blamed on Avian Flu or Other Economic Factors

186.    The argument that the avian flu is responsible for the recent dramatic increases in egg prices is untrue and does not hold up under scrutiny. This is not the first time the U.S. egg industry has confronted a major outbreak of Highly Pathogenic Avian Influenza (HPAI). The previous significant occurrence took place in 2014.

187.    On December 11, 2014, avian influenza was detected in captive wild birds and backyard flocks. The situation escalated when, on April 11, 2015, the first infection was reported at a commercial egg-laying facility. The outbreak continued, with the last infection being documented on June 16, 2015.

188.    During this short period of just a few months, the industry suffered the loss of 43 million egg-laying hens and pullets, either through death or depopulation in response to the outbreak. Despite the severity of the 2014–2015 HPAI outbreak and the substantial reduction in the number of egg-laying birds, the industry's experience in that period does not support the current narrative that avian flu alone is responsible for the sharp and sustained increase in egg prices observed since 2022.

189.    In 2015, a 1% drop in flock size led to a 7.16% rise in egg prices, which normalized within a year. In comparison, as a result of the Defendant's unlawful conduct, each 1% decrease caused prices to jump 33% in 2022, 17% in 2023, and 25% in 2024.

190.    In each of 2022, 2023, and 2024, the number of layers culled were on par with or lower than the number of hens culled due to the 2014 Outbreak.

2015    43 million

2022    43.3 million

2023    12.8 million

2024    40 million

2025    28 million (thru mid-February)



191.    The escalation of egg prices in the United States is particularly notable when compared to developments in Europe. In 2022, Europe confronted a significant supply shortage following the depopulation of 50 million laying hens, exceeding the 43 million affected in the U.S. Nevertheless, European egg prices rose by approximately 30% between January 2022 and January 2023, while U.S. prices increased by nearly 170% during the same period.

192.    As referenced above, although U.S. egg production experienced a modest decline from 2022 to 2024, per capita output consistently exceeded per capita consumption during this timeframe. Notably, while consumer demand has tapered, the total value of egg production rose sharply—from $8.8 billion in 2021 to $19.4 billion in 2022, reaching $21 billion by 2024. Consequently, conventional supply and demand dynamics do not adequately account for the

substantial increases in egg prices observed during the Class Period.





193.    Furthermore, the costs associated with egg production have decreased. Feed expenses account for approximately fifty percent of overall production costs for egg producers, while natural gas is another substantial expenditure. Since 2022, the prices of both feed and natural gas have been consistently declining.

194.    Vital Farms produces pasture-raised and organic eggs. Its CEO defined the price increases by other egg producers during the first year of the bird flu outbreak a "head-scratcher." And while he did not outright accuse his competitors of price gouging, he stated, "I don't see anything in my cost structure that would have led me to raise our prices by as much as [reported]."

**Z.    The Avian Flu Is Largely Regional Egg Prices In The Southeast Demonstrate That Pricing During The Relevant Period Did Not Respond To Regional Supply And Demand Dynamics**

195.    The geographically limited impact of avian flu highlights the questionable basis for

egg producers' reliance on the outbreak as justification for coordinated price increases. Specifically, the Southeastern United States, which includes key egg-producing states such as Georgia, Alabama, and Florida, did not experience any confirmed Highly Pathogenic Avian Influenza (HPAI) outbreaks in commercial table egg flocks during the critical pricing window from 2022 through late 2024. Despite accounting for approximately 7% of national table egg production, this region actually increased its output in both 2022 and 2023 when compared to 2021.

196.    In further support of Plaintiff's allegations, USDA retail inventory data shows that the Southeast did not deviate meaningfully from its five-year historical average during the period of elevated pricing. Inventory levels remained in line with seasonal expectations, indicating that supply was adequate to meet consumer demand. These facts cast doubt on all theories advancing the self-serving fantasy that regional shortages were responsible for the significant rise in retail egg prices.

197.    Despite the absence of HPAI outbreaks and consistent supply, retail egg prices in the Southeast rose dramatically, reaching $2.99 per dozen in January 2023. This price point was not only well above the previous year's national average but was also comparable to prices in regions directly affected by HPAI-related production issues. Such pricing cannot be explained by local market conditions and instead points to a coordinated pricing strategy among egg producers.

198.    Moreover, there is no indication that the Southeast faced unique challenges such as disproportionate increases in feed costs, labor shortages, or transportation disruptions during this time. Without these cost pressures, the elevated retail prices appear disconnected from the actual costs of production and distribution.

199.    In summary, egg prices in the Southeast demonstrate that pricing during the

relevant period did not respond to regional supply and demand dynamics. Instead, they reflect a pattern of price manipulation by the dominant egg producers in the United States, who leveraged the UB index to impose uniform, above-competitive prices nationwide—even in areas without any confirmed HPAI impact.

### AA.    Defendants' Conspiracy Led To Huge Profits

200.    As a result of Defendants' conspiracy, the Defendants experienced a dramatic increase in profit margins. The increased value of its stocks were also very noteworthy.

201.    Cal-Maine Foods has kept sales stable, but profit margins have risen sharply, with several recent quarters' gross profits exceeding previous full-year results. Before the avian flu, gross profits were $179.6 million in FY20 and $160.7 million in FY21, with annual egg production holding at about 1.1 billion dozen eggs.

202.    After the 2022 avian flu epidemic, Cal-Maine's profits surged to $1.2 billion in FY23 (June 2022–June 2023) and $541.6 million in FY24 FY24 (June 2023–June 2024), with unchanged, stable annual sales of about 1.1 billion dozen eggs.

203.    In FY25, Q1 and Q2 gross profits were $247.2 million and $356.0 million. Since the AF epidemic began in 2022, Cal-Maine's quarterly profits rose by an average of 948%, and the company's stock price has increased more than one hundred percent (100%).



204.    Although Cal-Maine is the only publicly traded company among the Defendants, information suggests that all Defendants experienced significantly higher profit margins during the class period. The unprecedented profit surge—despite industry claims of struggles due to the avian flu—strongly indicates that price increases were not driven by supply constraints but rather by the Defendants' ability, as dominant producers in the U.S. market, to manipulate prices at the expense of their customers.

**BB.    Plus Factors Corroborate Defendants' Conspiracy to Fix Shell Egg Prices**

205.    Plus factors refer to economic actions and outcomes that extend beyond parallel conduct by oligopolistic firms. These factors are typically inconsistent with independent, unilateral behavior but align with coordinated conduct, thereby supporting the inference of a conspiracy. Detecting a cartel can be analogized to diagnosing a disease, with plus factors serving as indicators that enhance the reliability of such a diagnosis.

206.    In addition to the ongoing DOJ investigation, the plus factors that support the

existence of a conspiracy here also include: (1) each Defendant acting against its unilateral self-interest; (2) a consolidated industry; (3) Defendants' opportunities to conspire; (4) a market characterized by high barriers to entry; (5) price inelasticity; (6) eggs are interchangeable products; and (7) Defendants are recidivist antitrust violators.

### 1.     Defendants Acted Against Their Own Interest

207.    Defendants' conduct during the relevant period indicates coordinated restraint instead of independent action in the market.

208.    To start with, no individual producer Defendant has the capacity to significantly affect the Urner Barry Index, which serves as the industry's central pricing benchmark. The index is formulated from aggregated market data, and any singular producer submitting prices that markedly diverge from established market conditions risks compromising their credibility. Such discrepancies may lead to exclusion from future reporting, thereby forfeiting access to an essential pricing resource used for contract negotiations and market positioning. As a result, engaging in unilateral price inflation would be against a Shell Egg Producer Defendant's unilateral self-interest.

209.    Next, in a real-world competitive market environment, producers are generally incentivized to increase output on an expedited basis in response to rising prices and expanding profit margins. The underlying economic principle is clear: producers will better benefit from higher prices before competitors adjust and a supply increase stabilizes prices. Historically, this pattern has been observed with rapid production recoveries after avian flu-related supply shocks.

210.    The unlawful conduct referred to in the instant complaint incudes the fact that the Defendants collectively delayed the return of production despite favorable conditions and declining costs.

211.    Sustained high prices are only possible under such circumstances where all major

producers refrain from increasing output, requiring mutual assurance that no party will seek additional market share. This type of coordinated conduct diverges from individual self-interest and is indicative of a shared understanding among Defendants to limit competition and maintain elevated prices.

### 2. Market Concentration and Defendants' Dominance in the U.S. Egg Industry

212.    Defendants collectively hold a commanding presence in the United States egg market, as they are the leading egg producers and together control nearly 40% of the overall market share. This concentration of market power enables them to exert significant influence over pricing, supply, and industry practices.

213.    The top five U.S. egg companies control 46% of laying hens; Cal-Maine leads with about 20% market share and 75% more hens than its nearest competitor. Their eggs mainly come from large, consolidated farms.

214.    The number of U.S. egg producers dropped from 2,500 in 1986 to 700 by 2002. In 1982, half of egg-laying hens were on farms with 62,000 or fewer birds; by 2012, half lived on farms with at least 925,000 hens.

215.    Among the Defendants, Cal-Maine stands out as the largest egg producer in the country. The company's operations are so extensive that it is responsible for producing more than one out of every five eggs consumed across the United States. This dominant position underscores Cal-Maine's pivotal role in shaping market dynamics.

216.    The current structure of the egg market is the result of decades of consolidation, primarily driven by the largest producers systematically acquiring smaller farms. Since 1989, Cal-Maine alone has completed 25 acquisitions, strategically expanding its production capacity and market reach. In 2023, Cal-Maine further strengthened its position by acquiring two significant

assets: ISE America Inc. and Fassio Farms. These acquisitions added an additional 4.7 million and 1.2 million layers, respectively, to Cal-Maine's flock.

217.    Consolidation primarily advantages the largest participants, namely the Defendants. For example, Cal-Maine's net profit increased significantly from $18 million in 2020 to $785 million in 2023 and $278 million in 2024, attributable to its impact on market pricing.

218.    Other leading producers have also engaged in substantial expansion efforts. In 2023, Rose Acre Farms invested $100 million to establish a new facility in Arizona designed to house 2.2 million cage-free hens. Rose Acre Farms announced plans in 2024 to add further cage-free farms in Indiana, which will accommodate an additional 1.2 to 1.3 million hens.

219.    In 2023, Daybreak Foods, the fourth-largest producer, grew by acquiring Hen Haven LLC and Schipper Eggs LLC.

### 3.    Defendants Regularly Participate in Shared Activities Ripe for Collusion

220.    Judicial decisions have repeatedly recognized that industries where competitors are involved in trade associations, joint ventures, and maintain regular communication are particularly vulnerable to collusion and that these interactions create environments where parties can exchange confidential information, including pricing strategies and production outputs.

221.    The defendants are members of United Egg Producers ("UEP"), a leading national egg industry association founded in 1968 to control production and stabilize egg prices.

222.    Defendants have not only been members of UEP, but since the early 2000s, have played a predominant role in its leadership. Defendant Cal-Maine began to participate actively following its attainment of market dominance. In 2002, after more than thirty years without membership, Defendant Rose Acre joined UEP; subsequently, its CEO, David Rust, accepted a position on the Board to contribute to decision-making processes. The collaborative and anti-

competitive activities are referenced in the *Kraft* case.

223.    UEP conducts its activities through member-only boards and committees, allowing major stakeholders to meet, coordinate, and share confidential information.

224.    The UEP recently lobbied the USDA to increase payments to egg producers under the Animal Health Protection Act. To advocate for a fair formula, committee members likely shared and compared competitively sensitive, and normally confidential information. Cal-Maine and Rose Acre executives represented the UEP.

225.    Although UEP is the largest national egg industry association, there are multiple smaller organizations that also present opportunities to collude. For example, the World Egg Organization (WEO) hosts an annual Global Leadership Conference. Marcus Rust of Defendant Rose Acre Farms was recently named WEO International Egg Person of the Year.

### 4.    Egg Industry Has Formidable Entry Barriers

226.    Any potential entrant into commercial high volume egg production faces significant entry and exit barriers, a characteristic that leads to further market concentration. Barriers to entry include large up-front capital investments to either purchase existing facilities or start new ones of sufficient scale.

227.    In March 2022, Cal-Maine invested $82M to expand cage-free facilities at two farms. In 2023, it bought Fasio Egg Farms for $54-$67M, and in 2024 spent $110M acquiring ISE America's operations, adding capacity for 4.7 million hens.

228.    In May 2023, Rose Acre broke ground on a new farm in Arizona, which is projected to cost $100 million.

229.    In 2013, the USDA released the Poultry Industry Manual under the FAD PReP/NAHEMS Guidelines. The report makes clear that egg production requires significant capital investment:

"A typical Midwest multi-age, in-line egg production facility contains 1.5 to 4.0 million laying hens. With a 75% average rate of lay and eggs priced at $0.95 per dozen, 1.25 to 3.0 million eggs produced each day have a market value of $98,960 to $237,500. Typical modern in-line egg production operations in the Midwest may have chickens in cages with 67 square inches per bird, grading and packing equipment, egg-breaking machines to produce liquid whole eggs, and rooms for packing, cooling, and storing eggs. Capital investment for this type of facility ranges from $24 million for an operation with 1 million chickens ($24/hen) to $80 million for a 4 million bird complex ($20/hen)."

230.    The high barriers to entry and exit in the Shell Egg market makes the egg industry particularly prone to collusion and makes it easier for firms to collude and keep prices high, as new competitors are unlikely to disrupt the market .

## 5.    Inelastic Demand for Conventional Eggs

231.    The U.S. egg market is susceptible to collusion, primarily due to consistently inelastic consumer demand.

232.    Price elasticity of demand describes how demand for a good respond to price changes. Where consumers will purchase as much as they need of a product regardless of price, demand is considered inelastic. Inelastic markets are more susceptible to competitors colluding or fixing prices because there is little risk of losing sales or profit.

233.    Demand for eggs generally is inelastic—i.e., demand generally remains stable (or increases) when prices increase. The inelasticity of demand for eggs is widely acknowledged by industry insiders. UEP president Gene Gregory told Egg Industry magazine in February 2007, "[w]hether eggs are 39 cents or $1.25 per dozen, customer purchases are the same." More recently, Defendants acknowledged that a very small change in actual or perceived supply of eggs can cause a disproportionately large change in egg prices.

234.    The demand for eggs is considered inelastic, with consumption remaining stable or even increasing as prices rise. This inelasticity is well recognized within the industry; for example, UEP President Gene Gregory noted in Egg Industry magazine (February 2007) that customer

purchasing behavior remains consistent regardless of whether egg prices are 39 cents or $1.25 per dozen. Statistics and market reports make clear that nothing has changed since that statement was made.

235.    Agricultural economist Jada Thompson noted, "Eggs remain an essential commodity. Consider the various egg processors involved in bread production; consumer demand for bread persists, necessitating ongoing procurement of eggs. Given the current low supply, purchasers are compelled to compete for available eggs, driving continued bidding activity." Jada Thompson also opined that companies like Cal-Maine benefit from high egg prices because they can sell when supply is limited.

236.    The American Egg Board published research that found that eggs offer unique nutritional and functional properties not matched by alternatives. Because eggs have no true substitutes, their demand is highly inelastic. Because shell egg buyers' purchasing does not change with price fluctuations, the Defendant producers were able to collectively raise prices above competitive levels without losing revenue.

### 6.    Standard Eggs Exhibit Significant Interchangeability

237.    The avoidance of price-based competition is the primary motivation for forming a cartel. When products are interchangeable, manufacturers primarily compete through pricing strategies. The desire to avoid price competition is a central reason for the formation of cartels; as such, cartels tend to arise more frequently among participants offering interchangeable goods. From an economic perspective, product interchangeability facilitates cartel behaviour by making it easier for members to observe and identify breaches of price-fixing agreements.

238.    Shell eggs are largely undifferentiated commodities, with little variation between producers. Advertising is minimal, focusing mainly on the product itself, such as the American Egg Board's "the Incredible, Edible Egg" campaign.

### 7.    Defendants are Recidivist Antitrust Violators

239.    The Defendants have a history of anti-competitive behavior.

240.    As detailed above, in 2011, major food companies like Kraft Foods and Kellogg sued top egg producers, including Cal-Maine and Rose Acre Farms, alleging they limited U.S. egg supplies to raise prices. In 2023, a federal jury found Cal-Maine and Rose Acre Farms guilty of price-fixing between 2004 and 2008, violating antitrust law. *See Kraft Foods Glob., Inc. v. United Egg Producers, Inc*., No. 11-CV-8808, 2024 WL 4346418, at *1 (N.D. Ill. Sept. 30, 2024) (Seeger, J.).

241.    This wasn't the only or first time Cal-Maine has been implicated in using its power to profit from disaster. A complaint filed by the State of Texas accused Cal-Maine of price gouging at the start of the COVID-19 pandemic. Texas's attorney general claimed that the company tripled prices without experiencing any shortage or supply chain disruptions.

242.    Additionally, on August 11, 2020, New York State Attorney General 's office filed a lawsuit against Hillandale Farms, accusing the company of price gouging during the COVID-19 pandemic. In the case, James highlighted that Urner Barry's indices function as a feedback loop, allowing egg producers like Hillandale Farms to cite those indexed prices as justification for imposing unconscionably excessive prices during a time of crisis. Hillandale Farms settled that case the next year by promising to no longer engage in price gouging and donating 1.2 million eggs to food banks.

243.    Another example - on August 11, 2020, New York's Attorney General sued Hillandale Farms for price gouging eggs during the COVID-19 pandemic, citing Urner Barry's indices as enabling excessive pricing. Hillandale settled in 2021, agreeing to stop price gouging and donate 1.2 million eggs to food banks.

## ANTICOMPETITIVE EFFECTS

244.    Defendants' anticompetitive conduct had the following effects, among others: (a) competition among the Defendants has been restrained with respect to egg prices; (b) the price of eggs has been fixed, stabilized, or maintained at artificially high levels; and (c) purchasers of eggs, including Plaintiff and the Class, have been deprived of the benefit of free and open competition.

245.    Defendants' violations of the antitrust laws have caused Plaintiff and the Class to pay higher prices for eggs than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and members of the Class have suffered damages in the form of paying supra-competitive prices for eggs in the United States. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing conspiracy is *per se* unlawful.

## CLASS ACTION ALLEGATIONS

246.    Plaintiff brings this lawsuit under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) as representatives of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased Conventional Eggs directly from any of the Defendants or their subsidiaries or affiliates during the period at least as early as January 1, 2022 until the ongoing effects of the conspiracy came to an end.

247.    Excluded from the Class are (1) all jurors assigned to this case; (2) Plaintiff's counsel and Defendants' counsel; (3) Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, and directors; and (4) any Judge or Magistrate presiding over this action and any members of their immediate families.

248.    Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery or consultation with experts.

249.    **Numerosity:** Plaintiff alleges there are thousands of Class members across the United States and its territories The Class is so numerous as to make joinder impracticable. The exact number of Class members is unknown to Plaintiff, as this information is currently within the exclusive possession of Defendants.

250.    **Commonality and Predominance:** Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Plaintiff and the class were injured by the same unlawful conspiracy to fix prices, and Defendants' anticompetitive conduct was generally applicable to all the members of the class, and relief to the class as a whole is appropriate. Questions common to the Class during the Class Period, include, but are not limited to:

a)    Whether Defendants engaged in conduct that violated Section 1 of the Sherman Act;

b)    Whether Defendants combined and/or conspired to fix, raise, maintain, or stabilize shell egg prices;

c)    Whether Defendants fixed, raised, maintained or stabilized egg prices sold to purchasers, or committed other conduct in furtherance of the conspiracy alleged herein;

d)    Whether Defendants' conduct resulted in or caused the ascertainable price of eggs directly sold to the Plaintiff and the similarly situated members of the Class to be higher than the prices that would have prevailed in a competitive market as a result of their restraint of trade;

e)    Whether Plaintiff and the similarly situated members of the Class suffered injured by Defendants' conduct and, if so, the determination of the appropriate Class wide measure of damages; and

f)    Whether Plaintiff and the similarly situated members of the Class are entitled to, economic damages or injunctive relief, and, if so, the nature and extent of such relief.

251.    **Typicality:** Plaintiff's claims are typical of the claims of Class members in that Plaintiff, like all Class members, have been injured by Defendants' misconduct — contracting, combining, or conspiring to fix, maintain, or raise the prices of eggs.

252.    Adequacy of Representation: Plaintiff will fairly and adequately represent and

protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including antitrust class actions. Plaintiff does not have any interests antagonistic to those of the Class.

253.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The amount of each individual Class member's claim is small relative to the costs required to adequately litigate the claims set forth in this complaint. Because the Defendants' financial resources are in context, limitless, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. Class-wide damages are essential to induce Defendants to comply with federal and state law. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

254.    **Injunctive relief**: Defendants have repeatedly refused to abide by the law, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## CLAIM FOR RELIEF

### Violation of the Sherman Act, 15 U.S.C. § 1
### (Against All Defendants)

255.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

256.    Defendants entered into and engaged in a continuing contract, combination, or conspiracy in restraint of trade or commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by agreeing with each other and with co-conspirators to fix, raise, stabilize, or maintain Conventional Egg prices at artificially high levels. Defendants and co-conspirators in fact

fixed, raised, stabilized, and maintained Conventional Egg prices at artificially high levels. Plaintiff and members of the Class directly paid artificially high Conventional Egg prices to Defendants and egg producer co-conspirators.

257.    Defendants' activities constitute a *per se* violation of Section 1 of the Sherman Act.

258.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining, and/or stabilizing Conventional Egg prices at levels above the prices that would have prevailed in a competitive market.

259.    For this violation of Section 1 of the Sherman Antitrust Act, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

A.    Certify this case as a class action, and appoint Plaintiff as Class representative and the undersigned attorneys as Class Counsel;

B.    Award all damages to which Plaintiff and Class members are entitled, including treble damages under the Clayton Act;

C.    Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

D.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and Class members, including enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing,

maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from

entering into any other contract, conspiracy, or combination having a similar purpose or effect,

and from adopting or following any practice, plan, program, or device having a similar purpose or

effect;

      E.      Award Plaintiff and Class members reasonable litigation expenses and attorneys'

fees as permitted by law; and

      F.      Award such other and further relief as the Court deems necessary and appropriate.

      G.      Enter a Final Judgment in favor of Plaintiff and the Class

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues triable as of

right.

DATED: December 11, 2025

By : */s/ Thomas Joseph Ellis, III*
Thomas Joseph Ellis, III
**Nolan Law Group**
20 North Clark Street
30th Floor
Chicago, IL 60602
Phone : (312) 630-4000
Fax: (312) 630-4011

Robert J. Bonsignore*
**Bonsignore Trial Lawyers, PLLC**
193 Plummerhill Road
Belmont, NH 03220
Phone: (781) 350-0000
Cell Phone: (781) 354-1800
Fax: (702) 852-5726

***Counsel for Plaintiff Yell-O-Glow***

*\*Pro Hac Forthcoming*